RALPH PIERCE GRAVES AND JOAN GRAVES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Graves v. Commissioner
Docket No. 5470-91
United States Tax Court
T.C. Memo 1994-616; 1994 Tax Ct. Memo LEXIS 623; 68 T.C.M. (CCH) 1445; December 19, 1994, Filed *623 Decision will be entered under Rule 155. For petitioners: Bruce I. Hochman. For respondent: Dwight M. Montgomery and Erin M. Collins. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the calendar years 1986 and 1987 in the amounts as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)(A)
Sec. 6653(b)(1)(B)
1986
$ 2,685
$ 2,013.75
[1]
1987
4,715
3,536.25
[1]
Respondent determined, in the alternative, for the year 1986 that petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B). [1] For the year 1987, respondent alleged in her answer to the petition in the alternative that petitioners are liable for the addition to tax for negligence under section 6653(a)(1)(A) and (B). *624 The issues for decision are: (1) Whether petitioners are entitled to deduct as charitable contributions amounts paid to the Owl Foundation in excess of the amounts of tuition payments for their children made by the Owl Foundation for each of the years 1986 and 1987; [2] (2) whether respondent properly determined additions to tax for fraud under section 6653(b) (1)(A) and (B) against petitioners for each of the taxable years 1986 and 1987; or, in the alternative, (3) whether petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B) for each of the taxable years 1986 and 1987. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Los Angeles, California, at the time of the filing of their petition *625 in this case. Petitioners timely filed their joint Federal income tax returns for the taxable years 1986 and 1987. Mrs. Graves attended Stanford University, where she earned her bachelor's degree in political science. Mrs. Graves was a homemaker during the years at issue. She had been previously employed as a leasing manager's assistant and as a sales manager's assistant at a stock brokerage firm. She also at times was self-employed and, at the time of the trial of this case, was employed as an administrative director on the ratings board of the Motion Picture Association. Mr. Graves earned his bachelor's degree from the University of Southern California with a double major in psychology and economics. He has worked as a stockbroker from 1965 through the time of the trial of this case. Mr. Graves has two children from a previous marriage: Michael, born January 21, 1966, and Theodore, born January 24, 1967. Petitioners have two children: Brooke, born May 1, 1973, and Kelly, born March 26, 1976. On December 12, 1977, Mr. Richard Dryer (Mr. Dryer) formed the Owl Foundation (the foundation or OWL). Mr. Dryer was president of OWL throughout its existence. On March 15, 1978, *626 the foundation submitted Form 1023, the foundation's Application for Recognition of Exemption (the exemption application), to the Internal Revenue Service (IRS). On the exemption application, the foundation listed its purposes as the following: (1) To accumulate funds for a special project at the University of Southern California which would clear mortgages on properties and deed those properties to the university; (2) to establish a veterinary medicine school in Nevada; and (3) to contribute to a "recently formed college" which was seeking to relocate. The foundation received a tax-exempt determination letter dated March 15, 1979 (the determination letter), from the IRS stating that it was exempt from tax under section 501(c)(3). The foundation was listed in publication No. 78, the Cumulative List of Organizations, described in section 170(c). In the determination letter, the IRS further determined that the foundation was an organization described in section 509(a)(2), and hence was not considered a private foundation within the meaning of section 509(a). By letter dated July 6, 1989, the IRS revoked Owl's tax-exempt status retroactive to the date of its formation, since its *627 "primary activity was to solicit funds from individuals for the ultimate purpose of paying for school tuition (and related costs) for their children." The IRS determined that the foundation's primary activity was not any of the activities listed on its exemption application. Mr. Dryer attended various social functions to solicit funds from potential contributors. [3] He represented to potential contributors that the foundation provided scholarships to needy students. Mr. Dryer informed potential contributors that the foundation would accept contributions for the amount of the tuition bill of the contributor's children, plus an additional 15 percent. Mr. Dryer stated to the prospective contributor that upon receipt of such a contribution the foundation would pay the tuition bill of the contributor's children in the form of a scholarship, and use the remaining 15 percent for overhead expenses and for scholarships for needy students. Mr. Dryer stated that the contributor would be allowed to take the full amount contributed as a charitable deduction for Federal income tax purposes. *628 In practice, the moneys in excess of tuition payments which the foundation received did not go to needy students, but were used by Mr. Dryer for expenses of the foundation and for personal purposes. When the foundation received payments from contributions of the tuition amount plus 15 percent, it would procure a cashier's check in the amount of the tuition to be paid and send it to the school being attended by the contributor's children. A thank-you letter would be sent to the contributor. The foundation did not process any scholarship applications, nor did it ever award scholarships based on financial need, scholastic achievement, or athletic ability. So long as the contributor included the additional 15 percent over the amount of the tuition fee for his children, the check was processed and the tuition bill for the contributor's children was paid by the foundation. The foundation never refused to award a scholarship to any student whose parents contributed the amount of the student's tuition plus the 15 percent additional amount. However, the foundation required that the contributor include the 15 percent in addition to the amount of the tuition before payments of tuition *629 would be made. In soliciting funds from potential contributors, Mr. Dryer would show them the determination letter as evidence of the foundation's legitimacy and tax-exempt status. Mr. Dryer would inform potential contributors that the contributions were charitable contributions which were legally deductible for Federal income tax purposes. Petitioners first learned of the foundation in the early eighties. Mr. Graves discussed the foundation with Mr. Dryer at social events attended by mutual friends of petitioners and Mr. Dryer. Petitioners saw Mr. Dryer occasionally during the early eighties. Many of petitioners' friends were contributors to the foundation. At a party at the home of Mr. Arthur McClure (Mr. McClure), an attorney and contributor to the foundation, Mr. Graves was approached by Mr. Dryer with respect to becoming a contributor to the foundation. Mr. Graves discussed the legality of the deductions with Mr. Dryer, who assured Mr. Graves that the IRS had audited the foundation and had approved the foundation's tax-exempt status. Petitioners relied on the determination letter in deciding whether to contribute to the foundation. Petitioners were under the impression *630 that their children would receive scholarships from the foundation if they contributed the amount of tuition plus 15 percent. However, they understood that these scholarships were not based on merit or on financial need, but were made solely because petitioners were contributors to the foundation. Petitioners made payments of the amount of their children's tuition plus 15 percent during each of the taxable years 1982 through 1987. Petitioners' children did not fill out scholarship, grant, or any other type of educational-related applications for the foundation for any year in which petitioners made a payment to the foundation. Petitioners' children were never interviewed by Mr. Dryer or by any other person associated with the foundation with respect to a scholarship, grant, or any other type of educational assistance. Petitioners knew that their children would not have received the scholarships had petitioners not contributed to the foundation, or if they had not contributed the additional 15 percent required by the foundation to be paid in order for the foundation to pay tuition for petitioners' children. Mr. Graves had no personal knowledge of the foundation's performing charitable *631 acts, but did occasionally receive letters from the foundation which stated that scholarships had been given to needy students. Petitioners paid the following amounts to the foundation during the taxable years 1982 through 1987: Year
Amount
1982
$ 10,400
1983
11,700
1984
13,200
1985
15,600
1986
11,100
1987
12,300
Total
74,300
Petitioners informed the foundation of the names of their children, the amounts of the tuition to be paid (less deposits previously made to the respective schools), and the schools to which checks were to be sent. The foundation paid tuition for petitioners' children beginning in 1982. In 1986 and 1987, the years here in issue, the tuition payments were $ 9,700 and $ 10,750, respectively. During the taxable years 1982 through 1987, petitioners' payments to the foundation averaged 15 percent over the amount of tuition paid for their children. The foundation provided petitioners with a thank-you letter for each payment, listing the amount of the stated contribution as the amount petitioners paid to the foundation. On their income tax returns for the years at issue, petitioners deducted the full amounts of their payments to the foundation, *632 without subtracting the amounts the foundation paid for their children's tuition. Petitioners claimed cash charitable contribution deductions on their income tax returns for payments to the foundation for the years indicated as follows: Charitable Contribution Deduction Year
Claimed for Payments to the Foundation
1982
$ 10,400
1983
11,700
1984
13,200
1985
15,600
1986
11,100
1987
12,300
Petitioners retained the canceled checks for the payments to the foundation. An accountant, Mr. Thomas E. Nicholson (Mr. Nicholson), prepared petitioners' Federal income tax return for each of the years 1982 through 1989. When petitioners took their information to Mr. Nicholson for preparation of their 1982 return, they inquired as to the deductibility of the payments to the foundation. Mr. Nicholson looked at a copy of the determination letter to the foundation that petitioners had retained, and looked at publications issued by a private tax service that listed organizations exempt from tax under section 501(c)(3) and those whose exempt status had been revoked. From review of these documents, Mr. Nicholson concluded that the foundation was exempt from Federal income tax and *633 contributions to the foundation were deductible by the contributor. Petitioners did not inform Mr. Nicholson that the foundation was paying tuition for each of their children at a private school. Mr. Nicholson did not ask petitioners if they had received anything in exchange for the contributions made to the foundation. It was not Mr. Nicholson's normal practice to ask clients whether they had received anything in return for a claimed charitable contribution. In June 1992, Mr. Dryer was indicted by a Federal grand jury for subscribing to a false income tax return, and aiding and assisting in the preparation of false income tax returns with respect to the activities of the foundation. Respondent, in her notice of deficiency to petitioners for the years here in issue, 1986 and 1987, disallowed the entire amount of petitioners' claimed deductions for payments to the foundation and determined an addition to tax for fraud in each year. In the notice of deficiency, respondent determined in the alternative an addition to tax for negligence for 1986, and for 1987 alleged in her answer in the alternative an addition to tax for negligence. OPINION Petitioners take the position that *634 they are entitled to deduct as a charitable contribution in each of the years 1986 and 1987 that portion of the payments to the foundation that was not used for tuition payments for their children. Petitioners argue that although the foundation's tax-exempt status was revoked retroactively, they are entitled to deduct the amounts contributed in excess of the tuition payments under section 1.509(a)-7(a), Income Tax Regs. Respondent's position is that petitioners are not entitled to any deductions under this regulation since petitioners were in part responsible for, or were aware of, the substantial or material change on the part of the foundation in its operations which gave rise to the revocation. In the alternative, respondent argues that the amounts paid to the foundation by petitioners were not "contributions" within the meaning of section 170(c). Section 170(a) allows deductions for charitable contributions made to organizations listed in section 170(c) [4] if such contributions are verified under the regulations. In this case, since the foundation's exemption was revoked retroactive to its formation, the foundation was not an organization listed in section 170(c) in either *635 of the years here involved. However, petitioners contend that they are entitled to the claimed deduction of the amount of the payment to OWL in excess of their children's tuition under the provisions of section 1.509(a)-7(a), Income Tax Regs. This regulation is applicable generally to section 501(c)(3) organizations which are not private foundations. *636 An organization that qualifies as an exempt organization under section 501(c)(3) [5] is a private foundation under section 509(a) unless it meets one of the criteria set forth in section 509(a)(1), (2), (3), or (4). [6]
*637 The determination letter stated that the foundation met the requirements under section 509(a)(2). Therefore, contributions to the foundation come under the provisions of section 1.509(a)-7(a), Income Tax Regs. This regulation provides as follows: Once an organization has received a final ruling or determination letter classifying it as an organization described in section 509(a)(1), (2), or (3), the treatment of * * * contributions * * * to such organization under sections 170 * * * will not be affected by reason of a subsequent revocation by the Service * * * until the date on which notice of change of status is made to the public (such as by publication in the Internal Revenue Bulletin) or another applicable date, if any, specified in such public notice. * * * Under this regulation, a contribution to an organization whose tax-exempt status has been revoked may be eligible for a charitable contribution deduction by the contributor if the contribution was made before the date of the notice of change. See Allen v. Commissioner,92 T.C. 1, 10 (1989), affd. 925 F.2d 348 (9th Cir. 1991). Section 1.509(a)-7(b)(1), *638 Income Tax Regs., further provides that this exception to the general rule is not applicable if the contributor: (i) Had knowledge of the revocation of the ruling or determination letter classifying the organization as an organization described in section 509(a)(1), (2), or (3), or (ii) Was in part responsible for, or was aware of, the act, the failure to act, or the substantial and material change on the part of the organization which gave rise to the revocation of the ruling or determination letter classifying the organization as an organization described in section 509(a)(1), (2), or (3) * * *
We have been cited no case by either party nor found any case which discusses when a taxpayer is in part responsible for, or aware of, the act or failure to act which gave rise to the revocation letter. However, from the record it is clear to us that petitioners were in part responsible for and aware of the act that gave rise to the revocation of the determination letter classifying the foundation as an organization described in section 509(a)(2). The foundation's exempt status was revoked because respondent found that the foundation's primary activity was to solicit funds from *639 individuals for the ultimate purpose of paying the tuition for the contributor's children along with a 15-percent fee for the foundation's services. In 1986, petitioners sent $ 11,100 to the foundation, earmarking $ 9,700 for tuition. The foundation then forwarded $ 9,700 to the respective schools attended by petitioners' children. In 1987, petitioners sent $ 12,300 to the foundation, of which $ 10,750 was earmarked for tuition for petitioners' children. The foundation forwarded the tuition payments in the total amount of $ 10,750 to the designated schools. In each of the years at issue, petitioners sent money to the foundation earmarking the exact amount that would pay for their children's tuition, and the designated amount was paid by the foundation to the schools indicated by petitioners. Their payments in each year included the fee charged by the foundation. Thus, petitioners were not only aware of, but actively participated in, the very activity that caused the foundation to lose its tax-exempt status. For this reason, we conclude that the exception under section 1.509(a)-7(b)(1), Income Tax Regs., is applicable, and that petitioners are not entitled to any deductions *640 for charitable contributions to the foundation in the years here involved. We also agree with respondent that the amounts paid to the foundation were not "contributions" within the meaning of section 170(c). A charitable contribution must be a payment made for inadequate consideration with disinterested and detached motives. Hernandez v. Commissioner, 490 U.S. 680, 690-691 (1989), affg. Graham v. Commissioner, 822 F.2d 844 (9th Cir. 1987), affg. 83 T.C. 575 (1984); Allen v. United States, 541 F.2d 786, 787-788 (9th Cir. 1976); Stubbs v. United States, 428 F.2d 885, 887 (9th Cir. 1970). In Graham v. Commissioner, supra at 849 the Court of Appeals for the Ninth Circuit stated: If a transaction is structured in the form of a quid pro quo, where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does *641 not qualify for the deduction under section 170.
Petitioners knew that their children were not receiving scholarships based on any type of merit or financial need. Petitioners knew that had they not contributed the amount of their children's tuition plus the 15-percent fee, they would not have received tuition payments in return. Petitioners were under the impression that even though they would receive most of the payments back in the form of tuition payments for their children, they would also receive a charitable contribution deduction for Federal income tax purposes for the full amount paid. Clearly, petitioners made payments to the foundation, including the 15-percent fee, in order to receive the tuition payments in return. Cf. United States v. American Bar Endowment, 477 U.S. 105, 116-118 (1986). Hence, no portion of their payments to the foundation constitutes a "contribution" for purposes of section 170, nor are their payments within the exception stated under section 1.509(a)-7, Income Tax Regs.
Petitioners contend that they are not liable for the additions to tax for fraud under section 6653(b)(1) [7] as determined by respondent. *642 Whether a taxpayer is liable for an addition to tax for fraud is a question of fact to be determined from the entire record. Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), affg. T.C. Memo. 1986-223; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Meier v. Commissioner, 91 T.C. 273, 297 (1988). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Edelson v. Commissioner, supra;Castillo v. Commissioner, 84 T.C. 405, 408 (1985). Fraud is intentional wrongdoing on the part of a taxpayer with the specific intent to evade a tax known to be owing. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), affg. T.C. Memo. 1983-249. In order to sustain her determination of fraud, respondent must show that petitioners intended to evade taxes *643 they knew or believed were owing. Kotmair v. Commissioner, 86 T.C. 1253, 1259 (1986). Fraud may be inferred from conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Id. at 1260; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud will never be presumed. However, since direct proof of a taxpayer's fraudulent intent is not readily available, fraud may be proven through circumstantial evidence and reasonable inferences which can be drawn therefrom. Edelson v. Commissioner, supra at 832; Akland v. Commissioner, supra at 621; Meier v. Commissioner, supra at 297. The Court of Appeals for the Ninth Circuit has identified certain types of circumstantial evidence from which fraudulent intent may be inferred. Such "badges of fraud" include: (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities. *644 Edelson v. Commissioner, supra at 832; Meier v. Commissioner, supra at 298-299. Respondent contends that several such indicia, as well as other indications of fraud, are present in the instant case, and that respondent has met her burden of proving fraud by clear and convincing evidence. Respondent notes that both petitioners are highly educated individuals and that Mr. Graves has an extensive background in financial matters. Respondent argues that since petitioners had experience in structuring profitable transactions and have realized substantial gains on the sales of stock and on partnership property, they must have known the charitable deductions they claimed were not allowable. Respondent argues that fraud was evidenced by the fact that petitioners did not inform their tax return preparer that they were receiving tuition payments in exchange for their payments to the foundation. Respondent also points out that in the request for admissions prior to trial, petitioners were requested to admit: Petitioners did not disclose to their tax return preparer for the 1986 Return and the 1987 Return that approximately *645 85 percent of the claimed deductions was used to pay the children's tuition.
Petitioners responded as follows: Deny that Petitioners did not disclose to their tax return preparer for the 1986 and 1987 returns the nature and manner in which monies were paid to * * * [the foundation]. When petitioners first included deductions on their tax return for contributions to * * * [the foundation] they advised their return preparer of * * * [the foundation's] scholarship program and how and why they made payments to * * * [the foundation] * * *
Respondent argues that this answer was intended to mislead. While the answer is not responsive, it is not false. In response to questions by an internal revenue agent at the beginning of the investigation, petitioners had disclosed the tuition payments and the circumstances of those payments. This disclosure negates an intention to conceal. We have considered respondent's arguments, but conclude that respondent has failed to show by clear and convincing evidence that any part of petitioners' underpayment of tax was due to fraud. Petitioners did not inform their return preparer that the foundation was paying tuition for their children. *646 However, their return preparer did not ask if anything of value was received in exchange for their claimed charitable contributions. There is no evidence to show that petitioners deliberately misled their return preparer. Petitioners' denial of respondent's request for admissions does not deny that petitioners were silent with regard to tuition payments received from the foundation. Neither petitioners' omitting to inform the return preparer of the tuition payments, nor the response to the request for admissions, is clear and convincing evidence of fraud when considered in light of all the circumstances present in this case. Respondent further argues that petitioners were fraudulent during the audit of their Federal tax returns. On respondent's questionnaire, petitioners were asked the following questions: Q Who else did you [petitioners] speak to regarding the Owl Foundation? A [I/We] Talked to an attorney that was involved in Owl - can't remember his name because it was so long ago. * * * Q Did anyone outside of the Owl Foundation advise you about the deductibility of the Owl contribution? * * * A Yes - one attorney - same one.
At trial, during Mr. Graves' direct *647 testimony, he was asked the question: Q Did you question the legality of the deduction with any person other than Mr. Dryer or Mr. Nicholson? A No. * * * Any thoughts I had of any questions of the foundation after Mr. Nicholson said it was in the book * * * it didn't occur to me, * * * it seemed like it was a great deal.
Mrs. Graves' testimony included the following: Q But you did not seek professional assistance in making * * * [the] determination as to whether or not this was a proper [deduction]? A No, because we had the * * * [determination letter] from the IRS * * *
Petitioners learned of the foundation at the home of an attorney, Mr. McClure, who they believed was a contributor to the foundation. Mr. Dryer was also a guest in this attorney's home. There is a difference between "speaking to" someone about the foundation and the deductibility of contributions to the foundation and discussing the legality of a deduction with a person. Mr. Graves testified that he did not discuss the legality of the deductions with anyone after his discussion with Mr. Nicholson, testimony that does not contradict the interrogatory answers given at the audit. Mrs. Graves *648 simply testified that they did not seek professional assistance, not whether she had talked with anyone else concerning the legality of the deductions. We conclude that the evidence in this case is insufficient to carry respondent's burden of proving fraud by clear and convincing evidence. Respondent has only proven that petitioners took deductions for charitable contributions for the years at issue and prior years which were improper. She has not proven that petitioners were fraudulent in doing so. Petitioners kept adequate records of the deductions taken, and properly filed their Federal income tax returns for the years at issue, showing that the claimed contributions were made to the foundation. There is no showing in this case of any concealment or other generally accepted badge for fraud. In fact, at the investigative stage of the case, petitioners informed respondent's agent of the tuition payments they received. Respondent's argument amounts merely to a contention that petitioners were so well educated they should have known that the transactions they entered into were not legitimate. Petitioners did not adequately investigate the legality of the claimed deductions, *649 and this failure to investigate arouses some suspicion that they did not want to learn more after being told the payments were deductible. However, such suspicions are not clear evidence of fraud. Respondent in effect asks us to presume fraud from facts that do not warrant such a presumption. We hold that respondent has failed to prove fraud by clear and convincing evidence for either 1986 or 1987. The final issue is whether petitioners are liable for the addition to tax for negligence under section 6653(a)(1). This section provides for an addition to tax where any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Negligence under section 6653 is defined as the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances. Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989). For the year 1986, respondent made an alternative determination of the addition to tax for negligence in her notice of deficiency, and therefore petitioners bear the burden of proving that they are not liable for such *650 addition to tax. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). For 1987, respondent alleged the addition to tax in the alternative in her answer, and, therefore, the burden of proof is on respondent for this year. Petitioners argue that respondent's affirmative allegations are inadequate to properly raise the issue of negligence for 1987. Respondent's answer states in the alternative that the deficiency was due to petitioners' negligence and, therefore, petitioners are liable for the addition to tax for negligence. This is clearly sufficient to raise the issue of negligence. Based on this record, the burden of proof is not determinative since the evidence establishes negligence on the part of petitioners. Petitioners knew that their children were not receiving the so-called scholarships from the foundation for any reason other than petitioners' payments to the foundation. However, they made no effort other than asking Mr. Dryer to determine whether, under these circumstances, the payments were deductible as charitable contributions. From the very nature of the transaction involved, a reasonable person would have made further inquiries. *651 On the fraud issue, we hold for petitioners, since respondent has not shown by clear and convincing evidence that petitioners knew the payments were not deductible. However, even if petitioners had a belief in the legality of their claimed charitable deduction, this fact does not excuse their negligence in not making further inquiry. Allen v. Commissioner, supra at 353. This is particularly true where the circumstances of the transaction were as suspicious as those here present. A reasonable and ordinarily prudent person of petitioners' education would certainly make further investigation of whether an amount that primarily paid tuition for their children was deductible. The failure to do what a reasonable and ordinarily prudent person would do under similar circumstances is negligence. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners further contend that the negligence penalty should not be assessed because in claiming the deduction they justifiably relied on the advice of their accountant, Mr. Nicholson. However, taxpayers are not protected by the advice of an accountant when they have not disclosed *652 all facts surrounding the transaction to the accountant, and, as a result, the accountant's advice is not based on knowledge of all the facts. Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217. Based on this record, we hold that petitioners are liable for the additions to tax for negligence under section 6653(a)(1)(A) and (B). Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Petitioners concede that they are not entitled to charitable deductions for that portion of the payment to the Owl Foundation which was used to pay private school tuition for their children for the years 1986 and 1987.↩
3. The terms "contributor" and "contributors" are being used since these terms were used by OWL, and not as a recognition that the persons making payments to OWL were making such payments as contributions.↩
4. SEC. 170(c). Charitable Contribution Defined. -- For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of -- * * * (2) A corporation * * * or foundation -- (A) created or organized in the United States or in any possession thereof * * * (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition * * * or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.↩
5. SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC. (a) Exemption from Taxation. -- An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503. * * * (c) List of Exempt Organizations. -- The following organizations are referred to in subsection (a): * * * (3) Corporations, and any * * * foundation, organized and operated exclusively for * * * educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * * ↩
6. SEC. 509. PRIVATE FOUNDATION DEFINED. (a) General Rule. -- For purposes of this title, the term "private foundation" means a domestic or foreign organization described in section 501(c)(3) other than -- (1) an organization described in section 170(b)(1)(A) (other than clauses (vii) and (viii); (2) an organization which -- (A) normally receives more than one-third of its support in each taxable year from any combination of -- (i) gifts, grants, contributions, or membership fees; and (ii) gross receipts from admissions, sales of merchandise, performance of services, or furnishing of facilities, in an activity which is not an unrelated trade or business * * * from persons other than disqualified persons * * * from governmental units described in section 170(c)(1), or from organizations described in section 170(b)(1)(A) (other than in clauses (vii) and (viii)), and (B) normally receives not more than one-third of its support in each taxable year from the sum of -- (i) gross investment income * * * (ii) the excess * * * of the amount of the unrelated business taxable income * * * (3) an organization which -- (A) is organized * * * exclusively for the benefit of * * * one or more specified organizations described in paragraph (1) or (2), (B) is operated, supervised, or controlled by or in connection with one or more organizations described in paragraph (1) or (2), and (C) is not controlled directly or indirectly by one or more disqualified persons * * * other than one or more organizations described in paragraph (1) or (2); and (4) an organization which is organized and operated exclusively for testing for public safety.↩
7. SEC. 6653(b). Fraud. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of -- (A) 75 percent of the portion of the underpayment which is attributable to fraud, and (B) an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax or, if earlier, the date of the payment of the tax.↩